IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STEPHEN LISS and BONI MELCHOR, on their own behalf and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SKECHERS U.S.A., INC.,<br><br>Defendant. | Case No.: 3:25-cv-05861-DGE<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Stephen Liss and Boni Melchor, on their own behalf and on behalf of others similarly situated, on information and belief except as to their own experiences and matters of public record, complains of Defendant Skechers U.S.A., Inc. as follows:

## I. INTRODUCTION

1. In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2. Among other things, CEMA prohibits transmitting a commercial email to a Washington resident's email address that "[c]ontains false or misleading information in the subject



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

line." RCW 19.190.020(1)(b).

3. Defendant Skechers U.S.A., Inc. ("Skechers"), does just what CEMA prohibits.

4. Skechers blasts Washington consumers, including Plaintiffs, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with Skechers' marketing for fear of missing out and chokes consumers' email inboxes with repeated false notifications that the time to act—*i.e. purchase*—is short.

6. And through this deceptive time-sensitivity, Skechers falsely narrows the field—steering consumers away from shopping for better deals—to its own products that must be purchased *now*.

7. Plaintiffs challenge Skechers' harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II. JURISDICTION AND VENUE

8. Defendant has invoked this Court's jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. §§ 1441, 1446, and 1453..

9. Venue is proper in the Western District of Washington, under 28 U.S.C. § 1441 because this district and division embrace the place from which Defendant removed this action, Thurston Superior Court (Case No. 25-00002-03207-34). .

## III. PARTIES

10. Plaintiff Stephen Liss is a resident of Wilbur, Washington.

11. Plaintiff Boni Melchor is a resident of Sequim, Washington.



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

12. Defendant Skechers U.S.A., Inc., is a corporation incorporated under the laws of Delaware with its principal place of business at 228 Manhattan Beach Blvd., Manhattan Beach, California 90266.

## IV. FACTUAL ALLEGATIONS

### A. CEMA protects Washington consumers from deceptive spam emails.

13. The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

14. In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

15. In the nearly three decades since, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

16. And the problems are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

17. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

18. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

19. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An*

*Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

20. Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21. This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

22. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23. The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

24. CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25. CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

26. CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

27. CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language,



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

28. CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

29. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B. The subject lines of Skechers' marketing emails make false time scarcity claims.**

30. One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

31. The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra* para. 30, at 22.

32. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 30, at 26.

33. Representations about the timing and duration of sales, discounts, and other special



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

35. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

36. Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

37. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

38. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

39. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

40. These false time scarcity claims are a staple of Skechers' email scheme to corral consumers to purchase its products.

41. **Urgent Spam Emails.** Skechers is practiced in this trick of luring in consumers through the use of urgent subject headings in emails that do not reflect the true availability of the



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

deal itself, as demonstrated below.

42. The emails discussed below are simply examples of a practice that Skechers has been running for years.

43. In a recent example from this year, on May 26, 2025, Skechers spammed consumers with an email stating, in the subject heading: "Long Weekend Savings End Tonight," offering an "up to 30%" deal that was purportedly "valid through 5/26."

44. But the deal did not end on May 26. The very same 30% off deal was offered on May 27, 2025, in an email with the subject line: "Surprise! Long Weekend Savings Extended for Today."

45. This marketing scheme is a pattern: Skechers offers a deal, stating in the email subject line that the offer is available only on that day (*e.g.*, "Today Only!", "Ends Tonight") even though the deal is offered again on the following day, and sometimes on several subsequent days.

46. Other examples from past years demonstrate that Skechers has been running this kind of deceptive strategy for years.

47. For example, on August 27, 2023, Skechers sent out an email with the subject heading: "25% off ends in 3...2...1 🕗 [.]" But despite the clock emoji facilitating the impression that time was short and that the promotion would end imminently, it did not.

48. On August 28, 2023, the next day, Skechers spammed consumers with another email with the subject heading: "SALE EXTENDED! One more day to save 25% off[.]"

49. In another example, on Monday, November 27, 2023, Skechers similarly spammed consumers with an email, saying in the subject heading, "ENDS AT MIDNIGHT: Claim your 30% off for Cyber Monday," but, in fact, the deal did not end at midnight on Cyber Monday.

50. On Tuesday, November 28, 2023, it sent another email extending the Cyber Monday sale, saying, in the subject heading: "EXTENDED: This is really it... 30% off ends



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

tonight!"

51. The next year, on August 26, 2024, Skechers blasted consumers with an email where the subject heading made a call for urgency, stating: "Hurry, 25% off Ends Today!"

52. But (again) the 25% off deal did not end on August 26. On the very next day, August 27, 2024, Skechers sent another email, with the subject heading, "Surprise! One More Day to Save with 25% off." As demonstrated in the fine print of the email, the very same "25% off" deal offered on August 26 was extended through August 27.

53. Then again, on September 23, 2024, Skechers emailed consumers, saying in the subject heading: "Ends Tonight: Up to 40% off + so much more!" But the sale didn't "end tonight."

54. Skechers emailed consumers the very next day, on September 24, 2024, to offer the very same deal—saying, in the subject heading: "SALE EXTENDED: Deals on slip-ins, boots + more!" Indeed, in the body of the email, Skechers made clear that it was "One more day to save!"

55. And in another instance, on November 20, 2024, Skechers spammed consumers with an email containing the subject heading: "Up to 30% off Ends Tonight." But, again, the 30% offer did not "end" that night.

56. The very next day, November 21, 2024, Skechers sent out the same 30% offer, in an email saying, "Black Friday Early Access 30% Off Starts Now!"

57. Not only did the "30% off" deal continue on November 21, 2024—as detailed in the fine print of that very same email, the deal lasted through November 28.

58. As another example from this year, on April 9, 2025, Skechers sent out an email to consumer with the urgent subject line, "Flash Sale Alert! Don't Miss Today-Only Savings," marketing a 20% off deal.

59. But the 20% off sale was not "today only." In a series of emails from April 10–15, 2025, Skechers promoted 20% off to consumers.



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

60. Skechers also repeatedly offers 25% off sales in emails where the subject lines misrepresent that a consumer has only days or hours to act to get the discount. Skechers uses a variety of deceptive language to communicate to the consumer that the deal is fleeting, though it is not. In 2022, for example, it advertised the deal in the following emails and subject lines:

a. 2/14/22: "With ❤️ from Skechers, last day for 25% off! Price as marked!"
b. 3/6/22: "Don't miss out, our 25% off sale ends TONIGHT!"
c. 3/12/22: "More daylight, more savings with 25% off!"
d. 3/13/22: "24 hours left: 25% off select styles!"
e. 3/28/22: "Spring into 25% off!"
f. 7/17/22: "Hurry, 25% off ends tonight!"
g. 7/21/22: "Get a head start on back to school with up to 25% off!"
h. 7/25/22: "Don't be late, up to 25% off ends TONIGHT!"
i. 7/27/22: "Summer savings are here — up to 25% off starts now!"

61. This trick continued in 2022 and 2023 with sales in different amounts.

a. 5/22/22: "Don't forget, 20% off ends TONIGHT!"
b. 5/23/22: "Text us, there's 20% waiting for you!"
c. 12/21/22: "Calling all Skechers Plus members: Take 20% for one day only!"
d. 12/22/22: "Flash sale EXTENDED! Members take 20% off"
e. 1/18/23: "FLASH SALE: Take 30% off boots!"
f. 1/19/23: "Flash sale extended for 24 hours only!"
g. 3/12/23: "The clock is ticking...20% off almost everything ends tonight!"
h. 3/13/23: "Sale extended one more day!"

62. Skechers also frequently offers sales targeted at its members, who may have signed up for deal access or for promotional benefits via Skechers website. For example, on January 30,


**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

2022, Skechers spammed consumers with an email with the subject heading: “Beat the clock, this member only exclusive sale ends TONIGHT! 🕘 [.]” The clock emoji heightens the urgency, while the all-caps word “TONIGHT” communicates to the consumer that the deal is time-limited. But that promotion would not end that night for Skechers members.

63. The next day, January 31, 2022, Skechers sent out another email with the subject heading: “EXTENDED: This member exclusive sale was too good to end!” Thus, the initial email on January 30, 2022 was deceptive.

64. Skechers also sent similar emails advertising time-limited member exclusive sales on the following dates with the following deceptive subject headings:

a. 1/9/23: “Our member exclusive sale ends tonight!”

b. 1/10/23: “Surprise! Member exclusive sale extended for one more day!”

c. 3/9/25: “Today Only! Members Take an Extra 10% Off”

d. 3/10/25: “Surprise! One More Day of Extra Savings!”

65. These and other examples of Skechers’ commercial emails whose subject lines contain false or misleading statements are attached to this Class Action Complaint as Exhibit A.

**C. Skechers knows when it sends emails to Washington residents.**

66. A sophisticated commercial enterprise, like Skechers, that is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

67. First, the sheer volume of Skechers’ email marketing put it on notice that Washington residents would receive its emails. Since 2021, Skechers has been blasting out marketing emails at a rate averaging (at least) 388 per year, 32 per month, and 1 per day.

68. Second, Skechers may obtain location information tied to email addresses when



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

consumers make purchases from Skechers through digital platforms, including Skechers' website, or otherwise self-report such information to Skechers.

69. Third, Skechers may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Skechers' emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

70. Specifically, Skechers appears to use Salesforce Marketing Cloud, and other third party applications, to manage its email marketing campaigns. Through Salesforce and the accompanying applications, Skechers can identify anyone who receives its marketing emails, determine who opens them, and track who clicks on any links within them.

71. Skechers is likely able to infer the general geographic location of recipients by state based on their IP address at the time of email open or link click.

72. Fourth, Skechers may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

73. Fifth, Skechers may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

74. Sixth, Skechers may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

75. It is thus highly probable that a seller of Skechers' size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

least at the state level.

**D. Skechers violated Plaintiffs' right under CEMA to be free from deceptive commercial emails.**

76. Skechers has spammed Plaintiffs Liss and Melchor with commercial emails whose subject lines contain false or misleading statements in violation of their right to be free from such annoyance and harassment under CEMA.

77. Both Plaintiffs received the May 26, 2025 "Long Weekend Savings End Tonight" email offering 30% off, described in paragraphs 43 and 44.

78. Plaintiff Liss additionally received the April 9, 2025 "Flash Sale Alert! Don't Miss Today-Only Savings" email offering 20% off, described in paragraphs 42 and 43.

79. The subject lines of these May 26, 2025 and April, 9, 2025 were false or misleading in violation of CEMA, as described at paragraphs 39-40 and 42-43, above.

80. These emails contained false statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V. CLASS ALLEGATIONS

81. Plaintiffs bring this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

82. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

83. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

84. Plaintiffs reserve the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

85. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

86. There are questions of law or fact common to the class, including without limitation, whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

87. Plaintiffs' claims are typical of the Class's because, among other reasons, Plaintiffs and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

88. Plaintiffs will fairly and adequately protect the Class's interests because, among other reasons, Plaintiffs share the Class's interest in avoiding unlawful false or misleading marketing; have no interest adverse to the Class; and have retained competent counsel extensively experienced in consumer protection and class action litigation.

89. Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiffs and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiffs and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

90. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

91. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action on as a class presents no special difficulties.

## VI. CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

92. Plaintiffs incorporate and realleges paragraphs 1–80 above.

93. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

94. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

95. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

96. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiffs and putative members were Washington residents through "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address". RCW 19.190.020(b)(2).

97. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

98. For Defendant's violation of CEMA, Plaintiffs are entitled to all available relief, including an injunction against further violations.

**<u>Second Claim to Relief</u>**

**Violation of the Consumer Protection Act, RCW 19.86.020**

99. Plaintiffs incorporate and realleges paragraphs 1–80 above.

100. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

101. A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

102. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

103. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

104. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

105. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

106. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

107. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

108. For Defendant's violation of the CPA, Plaintiffs and putative members are entitled to an injunction against further violations; the greater of Plaintiffs' actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII. JURY DEMAND

109. Plaintiffs will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII. PRAYER FOR RELIEF

Plaintiffs ask that the Court to:

A. Certify the proposed Class, appoint Plaintiffs as Class representatives, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiffs' and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C. Enter a judgment in Plaintiffs' and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiffs costs of suit, including reasonable attorneys' fees; and



**Smith & Dietrich Law Offices PLLC**
1226 State Ave. N.E., Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

E. Order such further relief the Court finds appropriate.

DATE: November 4, 2025

Respectfully submitted,
/s/ Walter Smith

Walter M. Smith
**Smith & Dietrich Law Offices, PLLC**
1226 State Ave NE, Suite 205
Olympia, WA 98506
360-915-6952
walter@smithdietrich.com

Lynn A. Toops*
Natalie A. Lyons**
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

J. Gerard Stranch, IV**
Michael C. Tackeff*
Andrew Murray**
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

Samuel J. Strauss
Raina C. Borrelli*
**STRAUSS BORRELLI, LLP**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiffs*
* Admitted *pro hac vice*
** Application for admission *pro hac vice* forthcoming/pending clerk action